UNITED STATES of America ex rel. Charles F. SCOTT, Petitioner-Appellee,

v.

Vincent R. MANCUSI, Warden, Attica Prison, Attica, New York, Respondent-Appellant.

No. 319, Docket 33375.

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1969.

Decided July 6, 1970.

Herald Price Fahringer, Buffalo, N. Y., for petitioner-appellee.

Joel Lewittes, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of the State of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for respondent-appellant.

Before LUMBARD, Chief Judge, ANDERSON, Circuit Judge, and BRYAN, District Judge.*

LUMBARD, Chief Judge:

The State of New York appeals from an order of the Western District which granted relator Charles Scott's petition for a writ of habeas corpus after a hearing. Scott claimed that his conviction, entered on a plea of guilty to manslaughter in the second degree, and his subsequent sentence to 7½ to 15 years in Attica State Prison, was invalid because (1) his plea was involuntary as it was induced by the assurances given to him by his own counsel that he would be sent to Washington, D. C.; (2) his plea was involuntary as his counsel had led him to believe that the plea could be withdrawn at any time before sentence; and (3) it was error for the trial judge not to accept his application to withdraw the plea before sentence when there was no apparent prejudice to the state. We find that the plea was voluntary and that there was no abuse of discretion. On the facts shown we believe there was insufficient evidence as a matter of law to support the conclusion of the district court that the plea was involuntary, and that the determination to the contrary was clearly erroneous. We reverse and dismiss the petition.

Scott was indicted in Erie County on November 30, 1962, charged with first degree manslaughter. Scott had fatally stabbed Arthur Lewis, aged 41, in a barroom brawl early in the morning of Oc-

* Sitting by designation.

tober 2, 1962. At the time, he was on parole, from a conviction in Washington, D. C., where on January 21, 1952, he had been convicted of second degree murder for the slaying of his paramour, and had been sentenced to 15 years to life. The stabbing in this case took place in a bar and it was apparently not disputed that Scott actually killed Lewis, the only issue being whether or not the killing was in self-defense. Scott had a prior conviction, was a parole violator, and whatever the outcome of the New York trial he was certain to be returned to Washington to serve more time. Consequently, counsel had good and sufficient reason to feel that Scott should plead guilty to a lesser offense and not stand trial.

On March 4, 1963, Scott's attorney, Herald P. Fahringer, Esq., met with the assistant district attorney and the trial judge, Frederick M. Marshall, and discussed the possibility of Scott pleading guilty to a reduced charge of manslaughter in the second degree. Counsel wanted the judge to suspend the sentence in New York and return Scott to Washington, D. C., as a parole violator. The judge, refusing to make any promises, said he would consider a suspended sentence if he could be assured that Scott would be required to serve at least five years upon his return to Washington. Counsel called the parole officials in Washington and a letter was subsequently sent by the Board of Parole stating that it would not consider any application for release until Scott had served at least two years and that there was "little possibility" that the Board would entertain such an application for at least five years.

The letter had been mailed, but not received when Scott and his counsel came before Judge Marshall on March 13, 1963. Scott then withdrew his earlier plea of not guilty to first degree manslaughter and entered a plea of guilty to second degree manslaughter. The court, after confirming Scott's desire to be near his family in Washington, then said:

"Your attorney has indicated to me that he's getting some correspondence from the correction or prison officials in Washington, D. C., which will indicate to the court what action they are going to take and he's going to submit that to me and after I have had this documentary evidence I will then have to make a determination as to whether or not I can send you back or whether you should go to Attica here in this state, are you aware of that?"

Scott responded affirmatively and then engaged in the following colloquy with the court:

The Court: In other words, I am not telling you now and I have not told your attorney or the assistant district attorney that you are under all conditions, under all circumstances going back to Washington, D. C. That might not happen.

The Defendant: Yes.

The Court: You are aware of that?

The Defendant: Yes, sir.

The Court: It might well be, after reviewing the papers and probation investigation that I might feel that the interest of justice might be served by your being sentenced to serve your term here in New York State.

The Defendant: Yes.

The Court: Now, with that explanation do you want to say anything?

The Defendant: Well, I don't guess I have anything to say.

The Court: Has everything I said been understandable to you?

The Defendant: It's been understandable to me.

The Court: Does it fairly and accurately represent the discussions that you have had with your lawyer and your understanding?

The Defendant: Yes, sir. But may I say this?

The Court: Yes.

The Defendant: I don't think anyone is justified in taking a life but in this particular incident I was reluc-

tant to enter a plea, sir, but I have been advised by my legal counsel and I think he was in better position to know than I.

The Court: Has any undue influence—

The Defendant: No, sir, none whatsoever.

The Court: —been exercised upon your will?

The Defendant: None whatsoever.

The Court: Are you being forced to do this?

The Defendant: No.

The Court: This entering of this plea is your—

The Defendant: My decision.

The Court: And your conclusion that it's the proper way out of the whole thing?

The Defendant: Yes, I would say that.

The Court: All right, now, you stand charged with manslaughter in the 2nd degree. How do you plead, sir?

The Defendant: I plead guilty, sir.

When Scott and his attorney appeared before Judge Marshall on April 1, 1963, for sentence, Scott asked that he be allowed to withdraw his plea. He had just had a conversation with his attorney, and apparently Scott had been given the impression that the judge was "somewhat cold" and had a "cold attitude" that day. He had asked his counsel whether it was "guaranteed" that he would be sent to Washington, and counsel responded that there were no "guarantees." Judge Marshall refused to allow the plea to be withdrawn, stating:

"If there is some substantial reason as to why he should be permitted to withdraw his plea I will permit it. If it's really because he's afraid he might go to Attica rather than Washington, D. C. and serve his time there, I'm not going to permit him to withdraw his plea under those circumstances."

Scott was then sentenced to 7½ to 15 years in Attica State Prison. The next day, April 2, 1963, Scott's attorney wrote to Judge Marshall requesting him to reconsider his denial of the application to withdraw the plea, pointing out that he had "prevailed upon [Scott] with some vigor to enter a plea of guilty because I felt he would be sent to Washington."

The district court found that there were no promises made by the trial judge or the prosecuting attorney which were not kept. On March 4, 1963, there was only minimal participation by the assistant district attorney and the examination which took place at the time the plea was taken was a clear indication to Scott that no promises had been made by anyone. We agree with the district court that "there is no evidence to support" the claim that promises had been made by the trial judge or prosecuting attorney.

■ However, the district court also found that the petitioner's retained counsel made misrepresentations to the defendant concerning the sentence which the petitioner would receive if he pleaded guilty, that the petitioner relied upon these misrepresentations in pleading and, therefore, his plea of guilty was not voluntarily made. We believe these findings to be clearly erroneous as the evidence presented by Scott is insufficient to show any misrepresentations.

■ A guilty plea, entered in either a state or federal court, must be voluntarily and knowingly made. Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); Waley v. Johnston, 316 U.S. 101, 62 S. Ct. 694, 86 L.Ed. 1302 (1942); Kercheval v. United States, 274 U.S. 220, 47 S. Ct. 582, 71 L.Ed. 1009 (1927). Further, a conviction which is based upon an involuntary plea of guilty is inconsistent with due process of law and is subject to collateral attack by federal habeas corpus. United States ex rel. Richardson v. McMann, 408 F.2d 48, 51–52 (2d Cir. 1969); United States ex rel. McGrath v. LaValle, 319 F.2d 308 (2d Cir. 1963).

Scott's first claim is that his plea was involuntary because his counsel had told him he would be sent to Washington, if he entered the plea. There is no evidence, however, that Scott was told by his counsel that he would definitely be sent to Washington if he entered his plea, although counsel did testify at the hearings that he had told Scott that he "felt sure" that he would be sent to Washington. It is apparent that no "guarantees" were made by counsel to Scott. Furthermore, the pleading colloquy which occurred in court demonstrates that Scott knew the matter was still far from settled.

■■■ The representations made by counsel to Scott were couched in the language of hope rather than of promise and were merely estimates made in good faith as to what he thought would result when the letter from the parole authorities was received. It is well settled in this circuit that "[A]n erroneous sentence estimate by defense counsel does not render a plea involuntary." United States ex rel. Bullock v. Warden, Westfield State Farm for Women, 408 F.2d 1326, 1330 (2d Cir. 1969); United States v. Parrino, 212 F.2d 919 (2d Cir. 1954); see United States v. Lester, 247 F.2d 496, 501 (2d Cir. 1957) indicating that "[T]he fact that the defendant may have had expectations that his plea would result in leniency is not sufficient, in the absence of evidence that the expectation was induced by the government, to justify withdrawal of the plea." United States ex rel. McGrath, supra; United States v. Lowe, 173 F.2d 346 (2d Cir.), cert. denied, 337 U.S. 944, 69 S.Ct. 1499, 93 L.Ed. 1747 (1949).

Scott next alleges that counsel had told him that he could withdraw his plea

before he was sentenced. Although the evidence is not clear as to exactly what counsel told Scott and it appears that counsel never directly told him that he had an absolute right to withdraw the plea for any reason whatsoever, there is testimony indicating that Scott could have believed that he could withdraw his plea. The question is, however, how much weight to attach to this testimony and claim arising for the first time almost 5½ years after the events in dispute.

■■■ Counsel's statement that the plea could be withdrawn is certainly contrary to New York law, which allows a plea to be withdrawn before sentence only in the discretion of the trial judge. N.Y. Code of Cr.Proc. § 337 (McKinney). However, this misstatement of law is not so serious as to result in the plea being involuntary. Although the district court found that Scott relied heavily on the advice of counsel in pleading, which advice included both the suspended sentence representation and the representation that he had the right to withdraw his plea, it is apparent that the major impetus behind Scott's plea was his desire to be sent to Washington and not reliance on the fact that the plea could be withdrawn.

It is important to note in this regard that the allegation that counsel misstated the law was not made in Scott's original petition sworn to February 13, 1968. The focus of the petition is the claim that the trial judge had indicated that he would be sent to Washington, D. C. The claim regarding the misstatement of law was apparently made for the first time at the hearing. This claim is conspicuously absent from the petition, the correspondence between Scott and his counsel,[1] and the letter of counsel to

1. Scott and his counsel exchanged several letters after the plea and conviction. On December 12, 1964, Scott wrote a letter expressing his frustrations after he had learned that the appeal had been rejected by the Appellate Division, and counsel responded on December 28, 1964. Scott again wrote counsel on July 18, 1966,

notifying him that Scott had filed an application for a writ of coram nobis based on "the unconstitutional breech [sic] of promise perpetrated by the Hon. Frederick Marshall * * *." Counsel replied in a letter dated July 23, 1966, expressing his sympathy with the application and offering his assistance.

Judge Marshall on April 2, 1963.[2] Scott was aware of the New York statute for he argues extensively in his petition that the trial judge has abused his discretion, but he never once makes the argument that he had been misled into believing that he had an absolute right to withdraw his plea.[3] Although the argument would perhaps have been a strong one if made at the time the request for withdrawal was made, coming now, 5½ years after the event at a time when there is every reason to recall past conversations in a favorable light, it should be accorded little weight. There is no doubt that the central and motivating factor behind the plea was Scott's desire to be sent to Washington, and his disappointment over the failure to be sent there is not sufficient to warrant the granting of the writ.

Scott's real argument on this point is that the misstatement of counsel regarding New York law has resulted in a deprivation of his right to effective counsel as required by the Sixth and Fourteenth Amendments, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). This argument is not supported by the record. Although it is surprising that counsel would not be aware of the governing New York statute, his conduct was not such as would "shock the conscience of the Court and make the proceedings a farce and mockery of justice."

United States ex rel. Boucher v. Reincke, 341 F.2d 977, 982 (2d Cir. 1965); quoting from United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L. Ed. 586 (1950); United States v. Silva, 418 F.2d 328 (2d Cir. 1969); United States v. Horton, 334 F.2d 153, 154 (2d Cir. 1964). See also, United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967) where it is stated that for there to be a lack of compliance with the fundamental fairness essential to due process, counsel's representation must be so " 'horribly inept' as to amount to 'a breach of his legal duty faithfully to represent his client's interests.' * * *" The present case is a long way from meeting the tests set out above.

Scott's third and final point, that he should have been allowed to withdraw his plea before sentence was imposed as there was no prejudice shown by the state, deals not with the voluntariness of his plea, but rather with the discretionary authority of the trial judge. A criminal defendant has no absolute right to withdraw a plea of guilty. Permission to do so rests in the sound discretion of the trial judge. In a federal trial permission to withdraw a plea "may be granted at the discretion of the trial court and a denial thereof is reversible only if it appears that there

2. This letter merely expresses counsel's disappointment over the actual sentence received and makes no reference to the claim that Scott had been led to believe that he could withdraw his plea.

3. On redirect, the following was stated:
Q. Was he not given the assurance— the reassurance that if the disposition did not work out he could always withdraw his plea? A. Oh, yes, I told him that. I indicated to him after we entered the plea, and as a matter of fact, I might have said it before he entered the plea, that if he had any misgivings I thought we could apply—we would be permitted to withdraw the plea.
Q. So that prior to Mr. Scott actually entering the plea it was his understanding that if he entered the plea to the reduced charge, in return he would be sent

back to Washington, D. C., or in the alternative, if he wasn't going to be sent back he could always withdraw his plea? A. Well, Mr. Schroeder, I didn't tell him after he was sentenced he could withdraw his plea, because I understand that to be the law.
Q. No, no. A. Yes, I did understand the law to be he could withdraw his plea up until any time he was sentenced.
Q. I am sorry if I said "after sentence." It was his understanding in the alternative if he wasn't going to be sent to Washington, D. C. that after sentence he could always withdraw his plea. That was Mr. Scott's understanding of this whole arrangement? A. Absolutely.
This ambiguous language is susceptible to the interpretation that the trial judge may allow withdrawal of the plea but that it is not mandatory that he do so.

has been an abuse of discretion." United States v. Lester, *supra*, 247 F.2d at 500; United States v. Hughes, 325 F.2d 789 (2d Cir.), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178 (1964). On an application for habeas corpus by a state prisoner, our review also starts with the proposition that the motion rests in the discretion of the trial judge. United States ex rel. Rosa v. Follette, 395 F.2d 721 (2d Cir.), cert. denied, 393 U.S. 892, 89 S.Ct. 216, 21 L.Ed.2d 172 (1968); United States ex rel. Best v. Ray, 239 F.Supp. 632 (S.D.N.Y.1965), aff'd, 365 F.2d 832 (2d Cir. 1966), cert. denied, 386 U.S. 998, 87 S.Ct. 1319, 18 L.Ed.2d 347 (1967). See generally, ABA, Pleas of Guilty, § 2.1(b) (Approved Draft, 1968).[4] Here the state courts have passed on and rejected Scott's claims of abuse of discretion and we should not interfere with their determination absent a clear issue of constitutional dimensions.[5] As set forth earlier, the trial judge refused to allow the plea to be withdrawn because he felt that there was no substantial reason therefor, and we cannot say that his refusal was so arbitrary as to be a clear or unconstitutional abuse of discretion.

The evidence before the district court shows that the plea was the knowing and voluntary act of a man who had weighed the possibilities and had decided that his best chance to receive the disposition he so strongly desired was to plead guilty to the lesser charge. The fact that his desire was buttressed by the good faith advice of his counsel does not invalidate the plea nor make it involuntary. We are far from persuaded by the claims now belatedly put forward by Scott, which, if sustained, would afford an all too easy avenue for the invalidating of convictions on a plea of guilty. United States v. Horton, *supra*; see also United States v. Weese, 145 F.2d 135, 136 (2d Cir. 1944) where the basis for requesting a withdrawal of a plea was a statement by counsel that he had misled his client into being too hopeful as to the possibility of a suspended sentence, the court stating

"If on so flimsy a basis as this, amounting, at least at the actual time of the plea, to no more than counsel's hope for a suspended sentence, a plea can be withdrawn, it is obvious that an accused may safely indulge in a plea of guilty as a mere trial balloon to test the attitude of the trial judge, being reasonably secure in the knowledge that he can withdraw it without great difficulty."

The judgment of the district court is reversed and the petition for a writ of habeas corpus is dismissed.

4. Pleas of Guilty. § 2.1(b)
   "In the absence of a showing that withdrawal is necessary to correct a manifest injustice, a defendant may not withdraw his plea of guilty or nolo contendere as a matter of right once the plea has been accepted by the court. Before sentence, the court in its discretion may allow the defendant to withdraw his plea for any fair and just reason unless the prosecution has been substantially prejudiced by reliance upon the defendant's plea."
   See also the commentary on p. 58 stating
   "There does not appear to be any good reason for allowing withdrawal as a matter of right, absent a showing of manifest injustice, once the court has accepted the plea.
   "The standard does recognize the generally acknowledged discretion of the judge to permit withdrawal before sentence even in the absence of a manifest injustice. This is a matter solely within the discretion of the judge; he may but need not grant the motion."

5. On December 3, 1964, the appeal from the conviction of April 1, 1968, was affirmed by the Appellate Division, Fourth Department, without opinion, and leave to appeal to the New York Court of Appeals was denied on December 23, 1964. On September 21, 1966, an order was entered in the Erie County Court denying, without a hearing, petitioner's application for a writ of coram nobis. On June 15, 1967 the order was affirmed without opinion by the Appellate Division, Fourth Department, and on August 7, 1967, leave to appeal to the New York Court of Appeals was denied.

FREDERICK van PELT BRYAN, District Judge (dissenting):

The District Court held an evidentiary hearing in which the facts and circumstances relating to the entry of Scott's guilty plea to the lesser offense of second degree manslaughter and the occurrences prior and subsequent thereto were fully explored. Upon the evidence adduced at that hearing, the District Court found: (1) that Scott's attorney, Fahringer, misrepresented to Scott that if he pleaded guilty to the lesser offense he would receive a suspended sentence and be remanded to Washington, D. C. to finish out his limited term as a parole violator; (2) that Fahringer wrongly advised Scott that if this disposition did not work out Scott had the right to withdraw his guilty plea at any time; and (3) that Scott was induced to plead guilty to the lesser offense by these misrepresentations of fact and law.

Instead of receiving the suspended sentence which he believed he had been promised, Scott was sentenced to 7½ to 15 years in Attica State Prison. When Scott attempted to exercise what he had been advised by his attorney was his right to withdraw his plea before sentencing, his request was denied by the trial judge. This was because the advice that Scott could withdraw his plea at any time was contrary to New York law, which permits withdrawal of a plea before sentence only in the discretion of the trial judge. N.Y. Code of Cr.Proc. § 337 (McKinney).

In my view there was substantial evidence in the record before the District Court to support its findings and they are not clearly erroneous. The detailed evidence which supports these findings is as follows:

Scott was indicted for first degree manslaughter on November 30, 1962. He was represented by Herald P. Fahringer, an experienced criminal lawyer retained by his family to represent him. Scott pleaded not guilty to the charge. As the date of trial approached and preparations for trial proceeded, Fahringer and Scott discussed the course to be followed.

Scott believed that he could establish at trial that he had acted in self-defense and thus had a good chance of acquittal. On the other hand, he was on parole in Washington, D. C. on a sentence of 15 years to life after conviction on a plea of guilty to second degree murder. Scott and his counsel were aware that even if he were acquitted on the first degree manslaughter charge in Buffalo, he would still be returned to Washington to serve time as a parole violator.

Faced with this situation, Fahringer conferred with County Judge Marshall, the trial judge, and the Assistant District Attorney. He proposed a suspended sentence on a reduced charge of second degree manslaughter so that Scott could be returned to Washington to serve his time as a parole violator. Judge Marshall refused to make any promise but indicated that he would consider a suspended sentence on such a reduced charge if he were assured Scott would be required to serve at least 5 years when he was returned to Washington. Fahringer then made a call to the Washington parole authorities, who indicated to him that if Scott were returned to Washington after a suspended sentence he would be required to serve at least 5 years as a parole violator and that a letter to this effect would be sent to the trial judge. Fahringer so reported to Judge Marshall.

Fahringer then had further discussions with Scott and with Scott's family. Fahringer told Scott that if he pleaded guilty to the reduced offense of second degree manslaughter, he "felt sure" Scott would receive a suspended sentence and be sent to Washington. He told the same thing to Burt, Scott's nephew, and to Mrs. McKinnon, his sister, who repeated this to Scott.

Scott understood Fahringer to mean that "It had been agreed upon that if I would plead guilty to the lesser charge of second degree manslaughter, the Court would therefore suspend sentence

and remand me to Washington, D. C." Scott was still "reluctant and apprehensive to enter a plea" because he did not believe he was guilty. Fahringer told him that in the event that he did not receive a suspended sentence, "'he could always withdraw his plea." It was on this understanding that Scott agreed to plead guilty to the lesser charge.

On March 13, 1963 the case was called before Judge Marshall. Prior thereto Fahringer told Scott that if he was asked by the Court whether any promises had been made to him, he was to answer "No." On March 13th, Judge Marshall had not yet received the expected letter from the Washington parole authorities. Scott told the Court that he wished to change his plea. Judge Marshall then advised Scott that he would not make a determination as to whether he would send Scott to Washington or whether he would be sentenced to Attica State Prison until the letter from the Washington parole authorities had been received, and that he might not send Scott back to Washington and might feel that the interests of justice would be served by a term in Attica. Scott said he understood this, but went on to say that he was reluctant to enter a plea "but I have been advised by my legal counsel and I think he was in a better position to know than I." After stating, in response to the Court's question, that no undue influence had been exerted upon him and that the entry of the plea was his own decision, Scott pleaded guilty to second degree manslaughter.

Sentencing was set down for April 1, 1963. By this time Judge Marshall had received the letter from the Washington parole authorities. The letter stated in substance that if Scott were returned to Washington he would probably remain in custody for at least 5 years. Fahringer received a copy of the letter.

Immediately prior to sentencing, Fahringer went to see Judge Marshall. When Fahringer returned from that interview, he told Scott that the Judge was "somewhat cold" and "had a cold attitude." Scott asked Fahringer whether it was "guaranteed" that he would be sent to Washington. Fahringer told Scott, apparently for the first time, that there were no guarantees. Scott then got the wind up and determined to withdraw his plea of guilty, as Fahringer had told him he could, and to stand trial on the first degree manslaughter charge.

When Scott appeared before Judge Marshall for sentencing, Fahringer made an application on Scott's behalf to withdraw his guilty plea. Fahringer stated that Scott had some misgivings as to where he might be sent on sentence. Scott told the Court he had been reluctant to enter the plea in the first place. After conferring with Scott, Fahringer then stated to the Court that Scott said he was innocent of the charge, that it was not his intention to plead guilty to it and that he had done so on misrepresentations of counsel about which Fahringer was "most embarrassed" and felt "most badly." Scott explained to the Court that he had acted in self-defense and had only pleaded guilty on the advice of counsel.

After reviewing what had occurred on the day the plea was entered, Judge Marshall refused to permit withdrawal of the plea. He then sentenced Scott to 7½ to 15 years in Attica State Prison.

The next day Fahringer wrote to Judge Marshall requesting reconsideration of the application to withdraw Scott's plea, stating that he had "prevailed upon [Scott] with some vigor to enter his plea of guilty because I felt he would be sent to Washington." Judge Marshall again refused to permit the plea to be withdrawn.

This is not a case resting solely on the unsupported testimony of a disappointed defendant. Scott's testimony as to the misrepresentations of fact and law made to him and his reliance thereon was fully corroborated by the frank testimony of his embarrassed attorney.

I do not agree that Fahringer's misrepresentations with respect to sentence were, as a matter of law, representations

"of hope rather than of promise," as the majority indicates. The District Court was entitled to find from the evidence before it that the representations made amounted to an assurance of a suspended sentence which induced Scott's guilty plea.

Nor do I agree that the colloquy at the time of pleading necessarily indicated that Scott "knew the matter was far from settled." There is credible evidence that Scott was told by Fahringer before the pleading hearing opened that if he was asked whether any promises had been made, he was to answer in the negative. This is common enough where there have been plea negotiations.[1] Scott's responses to the Court's questions at the pleading hearing under these circumstances do not warrant overturning the finding of the District Court that he believed he would receive a suspended sentence if he pleaded guilty.

In any event, however, Scott was led to believe that he had another string to his bow. This resulted from the mistaken assurance of his attorney that he could withdraw his plea at any time. The misrepresentation of fact as to sentence and this misrepresentation of law should be considered together as the inducing cause of Scott's guilty plea. Taken together, they gave him what he had ample grounds to believe was an absolute assurance that nothing could go awry. When on the day of sentence Scott, for the first time, learned that there were no guaranties and thus that there had been misrepresentation as to the sentence, he sought to avail himself of the avenue which he had been led to believe was open to him in such a contingency by seeking to withdraw his plea. Only then did he learn that his attorney had misrepresented the law to him also and that he was caught in a web from which he could not escape.

The testimony of Fahringer and Scott before the District Court on which its findings were based was, for all practical purposes, uncontradicted. The credibility to be given to their testimony was for the District Court, which evidently believed the testimony as it had a right to do and based its findings upon that testimony. Thus the findings of the District Court are supported by substantial evidence, are not clearly erroneous and must be accepted. Rule 52(a), Fed. R. Civ.P. See Wright, Law of Federal Courts, § 96, at 429–432 (2d ed. 1970).

As the majority states, "A guilty plea entered in either a state or federal court must be voluntarily and knowingly made" and "a conviction which is based upon an involuntary plea of guilty is inconsistent with due process of law and is subject to collateral attack by federal habeas corpus." In Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Supreme Court recently restated these principles and the reasons for them in the following language:

> That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized. Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he

---

1. At the more formal part of the pleading process, the in-court appearance at which the defendant enters his plea, the parties typically act as though no prior negotiations had occurred. Trial judges, although they are aware that negotiation for pleas is a common practice, routinely ask the defendant whether any promises have been made to him. Notwithstanding the fact that the plea has been the subject of negotiation, the defendant usually answers in the negative and the prosecutor and defense counsel seldom indicate to the contrary.

"If the judge, the prosecution, or the defense counsel makes a statement in open court that is contrary to what he has been led to believe, especially as to promises made by the prosecutor or his defense counsel, * * * [the defendant] would no more challenge that statement in open court than he would challenge a clergyman's sermon from the pulpit." Trebach, The Rationing of Justice, 159–160 (1964).
A.B.A. Standards Relating to Pleas of Guilty, commentary at p. 61, § 3.1(a) (approved draft, 1968).

committed the acts charged in the indictment. He thus stands as a witness against himself and he is shielded by the Fifth Amendment from being compelled to do so—hence the minimum requirement that his plea be the voluntary expression of his own choice. But the plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. *Id.* at 748, 90 S. Ct. at 1468.

There was no misrepresentation by Court or prosecutor here. The issue posed is whether a guilty plea induced by misrepresentations of counsel as to the consequence of the plea, such as were made in the case at bar, should be allowed to stand. That question remains open in this Circuit. United States ex rel. Callahan v. Follette, 418 F.2d 903 (2d Cir.1969).[2]

What we are concerned with in such cases is whether or not the plea was the knowing and intelligent act of the defendant, made with knowledge and understanding of the consequences. The basic question is what the defendant was led reasonably to believe which induced him to plead guilty and not who brought about his state of mind.

Misinterpretations of counsel may be so egregious as to induce a defendant to plead guilty under a complete misapprehension as to the relevant circumstances

and likely consequences of so doing. A plea so induced is not the knowing and intelligent exercise of freedom of choice to which a defendant is entitled and cannot be said to be voluntary.

This case does not involve mere erroneous estimates of counsel as to possible sentence or unrealized hopes as to sentence induced by counsel's optimistic statements which, as the majority indicates, are plainly insufficient to render a plea involuntary. A defendant who pleads guilty always runs the risk of disappointment at the sentence.

Here the misrepresentations of fact and law by Scott's attorney, taken together, induced Scott to plead guilty under a complete misapprehension as to the relevant circumstances and the consequences of so doing. The misrepresentation of fact was a blanket statement as to what sentence Scott would receive. Plainly, the question of sentence is of the primest importance to a defendant faced with the problem of whether or not to plead guilty. The misinterpretation of law assured Scott that in the unlikely event that anything went wrong, he could always withdraw his plea. Having been misled both as to the sentence he would receive and as to his legal right to withdraw his plea, Scott cannot be said to have known and understood the consequences of pleading guilty.

Scott was in no position to make an intelligent, knowing choice as to the best course open to him, as is required before there can be a waiver of important constitutional rights. Indeed, what happened when his attempt to withdraw his plea failed and sentence was imposed

2. In *Callahan*, this Court was faced with the question of whether a guilty plea induced by representations of counsel as to sentence was voluntary. The Court did not reach that question since it held that the defendant had waived any objection to the plea by his failure to take the opportunity offered by the sentencing judge to move for withdrawal of his plea and to have his request for withdrawal determined. The Court said:

The question whether or not a plea must be held voluntary unless the state, that is, the judge or prosecutor, induced the plea by affirmative promises or statements as to sentence was reserved in United States v. Horton, 334 F.2d 153 (2d Cir. 1964). Cf. Machibroda v. United States, 368 U.S. 487, 493, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); U.S. ex rel. Ross v. McMann, 409 F.2d 1016, 1021 (2d Cir. 1969) (en banc). *Id.* at 904.

was the very opposite of what he had relied upon and had been led to believe would result from pleading guilty.

Under these circumstances I would hold that the District Court was correct in concluding that the plea was involuntary and should be set aside as in violation of due process.

Finally, I would hold, in any event, that the misstatements of counsel regarding New York law and regarding sentence, viewed in the light of all the circumstances, resulted in a deprivation of Scott's right to effective assistance of counsel, as required by the Sixth and Fourteenth Amendments.

Fahringer's advice to Scott that he had the right to withdraw his plea at any time was directly contrary to New York law. The New York statute was clear and unambiguous. Fahringer was not required to foresee any new development in the law or to give advice in an area where lawyers might have differing views. Cf. McMann v. Richardson, 397 U.S. 759, 769–771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Nor is this a case where "hindsight reveals tactical or strategic errors 'over which conscientious attorneys might differ.'" United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967). See United States v. Garguilo, 324 F.2d 795 (2d Cir. 1963); United States ex rel. Fazio v. Fay, 348 F.2d 418 (2d Cir. 1965), cert. denied 383 U.S. 938, 86 S.Ct. 1069, 15 L.Ed.2d 854 (1966); Edwards v. United States, 265 F.2d 909 (6th Cir. 1959). This was advice that any ordinarily competent attorney should have been able to give without difficulty. All he had to do was to read the New York statute. Not only was Fahringer wrong, but his "advice was [not] within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, supra, 397 U.S. at 7–11, 90 S.

Ct. at 1449. Scott was entitled to rely with complete confidence on the advice of his counsel on such an elementary legal proposition.

The misinterpretation of fact as to sentence was also "gross error." A defendant's attorney has an obligation to inform his client with complete candor and accuracy of the result of plea negotiations. For the ultimate decision as to whether or not to plead guilty is that of the client.

Scott's reliance on the misrepresentations of his counsel had most serious consequences for him. When his attempt to withdraw his plea turned out to be unsuccessful, Sott found himself irrevocably bound by his plea. As a result, he not only failed to receive the suspended sentence which he had been assured by his counsel he would get but also was foreclosed from exercising his constitutional right to stand trial. Instead, he was sentenced to 7½ to 15 years in Attica.

It is generally recognized that a defendant is deprived of the effective assistance of counsel if his counsel's conduct was of "such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949); United States v. Horton, 334 F.2d 154 (2d Cir. 1964); United States ex rel. Boucher v. Reincke, 341 F.2d 977, 982 (2d Cir. 1965); United States ex rel. Maselli v. Reincke, supra. There is conduct of such a kind "if counsel's representation is so 'horribly inept' as to amount to 'a breach of his legal duty faithfully to represent his client's interests.'" United States ex rel. Maselli v. Reincke, supra at 132; quoting from Kennedy v. United States, 259 F.2d 883, 886 (5th Cir. 1958), cert. denied, 359 U.S. 994, 79 S.Ct. 1126, 3 L.Ed.2d 982 (1959).[3]

---

3. In the recent case McMann v. Richardson, supra, the Supreme Court held that a defendant entering a guilty plea because of his fear that the state would use an allegedly coerced confession at trial could not challenge the plea in federal habeas corpus unless counsel's conduct was such that defendant was denied effective assistance of counsel. In this connection it should be noted that the Court said:

> In our view a defendant's plea of guilty based on reasonably competent advice is

Moreover, the results of the inept conduct of counsel must have been so prejudicial to the defendant as to have deprived him of substantial rights. United States ex rel. Maselli v. Reincke, *supra*, 383 F.2d at 132. When these two elements are present there is a fundamental lack of fairness essential to due process and defendant has been denied the effective assistance of counsel to which he is entitled under the Sixth and Fourteenth Amendments.

In United States ex rel. Maselli v. Reincke, *supra*, this Court, applying these standards, held that a convicted accused was denied the effective assistance of counsel when his retained counsel failed to move to set aside a guilty verdict and, although he knew an appeal was meritorious, failed to take an appeal as requested by his client. As a result the accused was deprived of his right to an appeal which would have been likely to have resulted in a reversal of his conviction.

The misrepresentations of fact and law by counsel in the instant case and the prejudice to Scott resulting from his plea in reliance thereon were of comparable dimensions to the derelictions of counsel and the resulting prejudice in *Maselli*. Here Scott's plea in reliance on the misrepresentations of fact and wrong legal advice given him by his counsel resulted in his being deprived of his right to a trial and possible acquittal. It is difficult to see how conduct of counsel could have had more disastrous consequences for the client.[4]

I would therefore hold that Scott was denied the effective assistance of counsel in this case and that the guilty plea should not be allowed to stand on that ground also.

I share the concern expressed by Judge Friendly in United States v. Horton, *supra*, about the danger of affording "an all too easy avenue for invalidating convictions on pleas of guilty." But I do not see that setting aside Scott's guilty plea on the highly unusual if not unique facts in this case would open up any such avenue.

I would affirm the order of the District Court.

an intelligent plea not open to attack on the grounds that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter not on whether a court would retrospectively consider counsel's advice to be right or wrong but on whether that advice was within the range of competence demanded of attorneys in criminal cases. On the one hand, uncertainty is inherent in predicting court decisions; but on the other hand defendants facing felony charges are entitled to the effective assistance of competent counsel. * * * * * * * * For the respondents in these cases successfully to claim relief based on Jackson v. Denno, each must demonstrate gross error on the part of counsel when he recommended that the defendant plead guilty instead of going to trial. * * * * * * * * * * * * [defendant] is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act. * * *

4. It should be noted that I do not question the good faith of Scott's counsel in the proceedings before the state court. Moreover, he acted commendably in candidly acknowledging his mistakes in the district court and in vigorously pressing Scott's cause as his assigned counsel on this appeal.