**UNITED STATES of America**

**v.**

**Rodolfo Rivera RIOS, Defendant.**

**No. 70 CR 592.**

United States District Court,
E. D. New York.

May 9, 1980.

Paul E. Warburgh, Jr., Axelrod & Warburgh, New York City, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant Rodolfo Rivera-Rios moves pursuant to *Fed.R.Crim.P.* 32(d) to withdraw a plea of guilty entered May 16, 1978 to one count of a nine-count indictment alleging air piracy and kidnapping in violation of 18 U.S.C. § 1201 and 49 U.S.C. § 1472(h), (i), (j), (k), and (*l*). This Court sentenced defendant on his plea to imprisonment for the remainder of his natural life, with eligibility for parole at such time as the Parole Commission may determine, pursuant to 18 U.S.C. § 4205(b)(2). He remains incarcerated at this date.

Defendant contends that his plea was not made voluntarily, in that he relied to his detriment on certain alleged representations by an official of the State Department regarding the length of his sentence. A hearing was held on June 29 and July 2, 1979, to determine the facts surrounding defendant's decision to plead guilty. For the reasons stated below, defendant's motion is denied.[1]

### I

According to the indictment, Rodolfo Rivera-Rios, acting alone, hijacked in flight a Boeing 747 operated by Pan American Airways and diverted the plane to Cuba on August 2, 1970. He was immediately incarcerated in a Cuban jail where he spent the next three years. Following his release, Mr. Rios was arrested by Cuban authorities

E. R. Korman, U. S. Atty., E. D. N. Y. by Francis J. Murray, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

1. The length of time between the hearing and our disposition of the motion must be attributed jointly to defendant's counsel and the Assistant United States Attorney assigned to respond to the motion. Both of them requested and were given considerable time to submit post-hearing Memoranda of Law. After missing the initial filing dates, counsel requested a series of extensions, the last of which called for defendant to file by November 9, 1979, and for the Government to reply by November 23, 1979. Without further notification to the Court, defendant ultimately filed his Memorandum on January 14, 1980 (over two months late) and the Government filed its Memorandum on April 4, 1980 (some 10 weeks beyond the two weeks following defendant's filing given the Government to respond).

We suggest to counsel that delay of this nature does a disservice to the parties involved and to this Court. Were it not for the importance to defendant of the issues raised in this motion, we might well have marked it "withdrawn" on November 10, 1979, and were it not for the defendant's extensive delay, we might have rejected the Government's answering papers.

for an unrelated offense and sent back to prison for another three years. He was released in April, 1977.

On September 1, 1977, the State Department opened a United States Interests Section in the Swiss Embassy in Havana, Cuba. One of the functions of the Interests Section and its staff of foreign service personnel was to arrange the repatriation of American citizens in Cuba. Sometime between September 1977 and February 1978, Mr. Rios and five other Americans who had allegedly hijacked aircraft to Cuba applied to and met with one Thomas Holladay, a consular official assigned to the Interests Section, expressing a desire to leave Cuba and seeking to have the State Department arrange for them to obtain passports. In turn, Mr. Holladay sought information from the State Department about the alleged skyjackers, and was informed that most of them faced prosecution for air piracy and kidnapping. Mr. Holladay told Mr. Rios and the others that, because of their unique situation, the State Department could arrange only for their return to the United States. Further, Mr. Holladay advised Mr. Rios and the others that they could expect to be prosecuted upon their return.

Mr. Rios and the others nevertheless persisted in their request to leave Cuba and return to the United States. In due course, their applications for passports were approved and their interest turned to what they could expect on their return. They again approached Mr. Holladay and inquired about the possible sentences they faced if they were convicted. Mr. Holladay's response lies at the heart of the instant motion. Although the impact of his response provides the basis for Mr. Rios's legal argument here, the substance of his response is essentially undisputed. According to his testimony at the hearing, which we fully credit, Mr. Holladay responded in the following manner to the alleged skyjackers' repeated inquiries:

"We [the Interests Section personnel] are not law enforcement authorities. We can't speak for the Courts in the United States. We don't know what will happen to them because only their day in Court— the judicial proceeding in the United States is going to give them that answer. They won't know the answer to that question until they had a trial." (Tr. 231)[2]

Mr. Holladay further testified that Mr. Rios and the others indicated that they had heard what had happened to other alleged skyjackers who had returned to the United States to face prosecution. Some of these individuals had reportedly received sentences as light as five years, while others had even received suspended sentences. When pressed to state whether they could expect the same, Mr. Holladay responded:

"We can't give you that answer. We don't know. You might get five, you might get a suspended sentence. . . And so there were conversations in which maybe, maybe, maybe, but there were never any promises made to those people to any of them, because we are not in a position to make promises because we have nothing to do with legal proceedings in the United States." (Tr. 232)

In spite of this information, Mr. Rios and the others returned to the United States on March 21, 1978, and were promptly arrested by law enforcement authorities. Mr. Rios was arraigned on April 3, 1978, and soon thereafter was committed pursuant to 18 U.S.C. § 4244 for a study and report to determine his competence to stand trial. After being found competent, Mr. Rios appeared with counsel in this Court on May 16, 1978, to enter a plea of guilty to the kidnapping charge in count 9 of the eleven-count indictment returned against him.

Prior to accepting the plea, this Court addressed Mr. Rios and advised him of the matters specified in *Fed.R.Crim.P.* 11(c), regarding the nature of the charge, his right to counsel throughout any proceedings, and the waiver of certain rights by his plea of guilty. Mr. Rios indicated that he understood. The Court then commenced the inquiry required by *Fed.R.Crim.P.* 11(d) to

---

**2.** References in the form "Tr. ——" are to pages of the transcript of the hearing.

determine whether Mr. Rios was entering the plea voluntarily.[3] The exchange proceeded as follows:

THE COURT: Have any promises of any kind including any promises or suggestions as to what sentence may be imposed been made to you by your lawyer, the Court, anyone in the U.S. Attorney's Office?

THE DEFENDANT: No, nothing.

THE COURT: Has anyone in the U.S. Attorney's Office or anyone else induced a plea of guilty from you?

THE DEFENDANT: No, no one.

THE COURT: Have you been threatened or coerced in any way into pleading guilty?

THE DEFENDANT: No, nothing. (Plea Minutes, May 16, 1978, at 9–10).

The inquiry then turned to Rios's understanding of the potential severity of his sentence.

THE COURT: Do you know what the maximum sentence which may be imposed for this offense is?

THE DEFENDANT: Yes.

THE COURT: What is it?

THE DEFENDANT: Life in jail.

THE COURT: Yes. You may be punished for any terms of years or for life in jail. So I can impose a sentence of 100 years on you. Do you understand that?

THE DEFENDANT: Yes.

\* \* \* \* \* \*

THE COURT: [To defense counsel] Does he fully understand in your opinion the ramifications of this plea that he can be sent away for the length of time indicated?

MR. KELLY: I believe he does, your Honor. (*Id.*, at 10–11).

On the basis of the inquiry, the Court determined that there was a factual basis for the plea, that the plea was being entered voluntarily, and that the defendant realized the potential severity of his sentence.

Mr. Rios appeared for sentencing on July 6, 1978. At that time, he was committed to the custody of the Attorney General for life and for a study and report pursuant to 18 U.S.C. § 4205(c), in order that the Court could obtain more detailed information on which to base Mr. Rios's ultimate sentence.

Following completion of the study and report, Mr. Rios appeared again for sentencing on December 29, 1978. After Mr. Rios declined the Court's invitation to make a statement on his own behalf,[4] the Court re-imposed the life sentence, with eligibility for parole under 18 U.S.C. § 4205(b)(2). Mr. Rios responded immediately with what may best be described as an outburst, asserting for the first time that he and Mr. Holladay had made a deal which had now been breached. He stated that in return for his guilty plea and his pledge to remain silent once he returned to the United States, he would receive a maximum jail term of five years. Mr. Rios's statements are set forth in their entirety in the margin.[5]

3. We note here the distinction between a plea such as the one here, where an alleged secret agreement now breached renders the plea involuntary, and a plea entered as the result of a formal, open plea agreement. The Court's province in the latter is governed by Rule 11(e) and does not involve primarily the defendant's state of mind as he enters the plea, as it does in the former. In the typical plea agreement situation envisioned by Rule 11(e), a defendant is fully aware of the factors "inducing" him to plead guilty, and relies on them freely because they openly redound to his benefit. In that sense, a Court presiding over a Rule 11(e) agreement is in the position of arbitrating an arrangement between parties negotiating at something akin to "arms-length." In the Rule 11(d) situation, however, the Court must concern itself with protecting the defendant, who is more likely to find himself in an inherently disadvantageous position.

4. "THE COURT: . . . Do you wish to say anything with respect to the sentence which I'm about to impose?

"DEFENDANT RIOS: What could I say? I don't have any power whatsoever concerning this." (Sentencing Minutes, December 29, 1978, at 7.)

5. "DEFENDANT RIOS: Let me just tell something to the Judge. I have to tell him that this man whose name is written over there, his name is Tom Holiday (sic), was a North American counsel (sic) over there in Cuba. He told me—he told me that if I would come here that I was going to get five years in jail and that I wouldn't have to say anything over here, noth-

## II

On this motion defendant asserts that he is entitled to withdraw his guilty plea on two grounds. First, he asserts that his plea was made involuntarily because it was induced by Mr. Holladay's alleged representations about the maximum severity of his likely sentence. Mr. Rios argues that he relied on those representations and would not have returned to the United States to face prosecution had he not had Mr. Holladay's assurance that he would receive no more than a five-year sentence. Second, he contends that this Court's Rule 11(d) inquiry to determine the voluntariness of the plea was inadequate to uncover Mr. Holladay's purported representations and Mr. Rios's subsequent detrimental reliance on

them. We find both claims to be without merit.

At the outset, we note that it is settled law in this Circuit that "[a] criminal defendant has no absolute right to withdraw a plea of guilty. Permission to do so rests in the sound discretion of the trial judge." *United States ex rel. Scott v. Mancusi*, 429 F.2d 104, 109 (2d Cir. 1970). Further, "[i]n a federal trial, . . . 'denial [of a motion to withdraw a guilty plea] is reversible only if it appears that there has been an abuse of discretion.' " *Id.* at 109–110, quoting *United States v. Lester*, 247 F.2d 496, 500 (2d Cir. 1957); *see also, Kercheval v. United States*, 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1926); *United States ex rel. Rosa v. Follette*, 395 F.2d 721, 726 (2d Cir. 1968). Defendant

ing at all, until I would find out exactly what was going to happen to me.

Since you have already said that, that means that you are trying to destroy me.

I ask you over here in this Court and this Judge that I will plead right here innocent and that the people should be brought over here, the people who said I had done that and that. People who said that I have done that and that. And here's the man with his address and everything.

(Defendant indicating)

"THE COURT: Well, I suggest that the United States Attorney take that information and check out what the defendant says. If there is any truth to it that some appropriate official of the United States made a promise to the defendant and he acted reliance on, of course the Court will consider it.

"MR. CARTER [for the Government]: Okay.

"DEFENDANT RIOS: And it was not only to me. It was to the six people who arrived here, but since they're afraid over here, they're afraid of the Judge, and they're afraid of the authorities here, so therefore they have not said anything and have remained silent, but I, in view of this situation, since it's going against me, my own security and my own integrity and my physical being, I say this now here. And that everybody should come here and tell me to my face what I have done because how can I come here in a situation that is going to destroy me? I had women, I was very well off there, you know. I was not in a good situation but I was living so therefore I came. I came here so that I could do what was right and do everything with the law here and that everything should be alright with my family. So then I see that over there it's bad. So then over here they want to do everything to me once again. Therefore I don't have anyone, right?

So therefore I want to know if truthfully Castro has given us up over here to the Department, the State Department here in Washington, D. C.?

"THE COURT: All right.

"DEFENDANT RIOS: Because I did that, that thing, meaning of my own doing over there, because my country is in a situation that is known, colonially, so therefore I've always been a fighter for the independence of my country, therefore now they are trying to, over here, to say that there is something wrong in my head because, you know, therefore all this prejudice is caused—I am an independent person, right? And I will always be that. And if I have to die in this situation, then I should be in it, but that I will never—but they're never going to change my ideals. I am not a communist and I've never been, but yes, I am an independent person who wants independence and I will always be that because over here they talk about a lot of illegalities, and in this country, this country has done a lot of illegal things, and in my own country in 1828 it was with violence and with strength, is what they did, they tried to get a hold of my country.

So who is it that is committing all these illegal acts? Once again, it was Panama, Nicaragua, Cuba too has intervened. Santo Domingo, right? Well, that's already history. That is all I want to say, that is all.

"THE COURT: All right.

"DEFENDANT RIOS: And that I want another trial here and that all these people who say that I have taken that plane or so, whatever it is I've done, that is all.

"THE COURT: All right, gentlemen." (Sentencing Minutes, December 29, 1978, at 9–12).

thus bears a heavy burden here to show three things: that Mr. Holladay actually made the alleged representations; that Mr. Holladay had authority to make them; and that Mr. Rios actually relied on them to his detriment.

 Mr. Holladay's testimony at the hearing as to what he actually said to Mr. Rios is virtually uncontroverted. Again and again, Mr. Holladay couched his responses to Mr. Rios's inquiries in the language of uncertainty. The closest he ever came to a prediction was expressed in these terms: You *might* get five, you *might* get a suspended sentence." Even at that, Mr. Holladay's watchword was "maybe, maybe, maybe." We find nothing disingenuous about these statements, especially in view of his repeated references to the ultimate discretion of the sentencing judge.

Mr. Rios virtually concedes the facial innocence of Mr. Holladay's statements, but argues instead that the focus of this Court should be on what Mr. Holladay should have known about the reliability of his statements. Defendant's Memorandum of Law, at 1–3. Mr. Rios argues that Mr. Holladay surely knew or should have known that other hijackers who had returned to the United States had received *more severe* sentences, and thus intended that his statements induce Mr. Rios to return and plead guilty, in order to face the same severe punishment. Allegedly, then, Mr. Holladay had an incentive to make his "five-year" or "suspended sentence" guess sound like a guarantee, which Mr. Rios, unaware of the extent of Mr. Holladay's authority to make such a guarantee would rely on.

This argument, however, is misplaced. The essential inquiry is what the words actually spoken meant to Mr. Rios, not what Mr. Holladay may have known and intended when he spoke them. Mr. Rios could not have mistaken the uncertain flavor of Mr. Holladay's statements. Any con-

ception of an implicit "guarantee" could have arisen only in Mr. Rios's mind after he returned to the United States and could not have been rationally based on anything Mr. Holladay said. In this regard, we note that Mr. Rios initiated a meeting with Mr. Holladay about returning to the United States, not vice versa. This fact gives rise to a strong inference that Mr. Holladay acted in good faith, with no preconceived intention to misguide Mr. Rios. By the same token, it seems equally likely that Mr. Rios may have approached Mr. Holladay with the intention of securing such a guarantee and failed to do so. Only now, with the potential severity of his sentence fully realized, does he attempt to give Mr. Holladay's statements a retroactive impact beyond their plain meaning. On this basis, we here make an explicit finding that Mr. Holladay made no representation that could conceivably amount to a "guarantee", and that Mr. Rios did not understand Mr. Holladay's statements to amount to a "guarantee".

While the above finding is dispositive of Mr. Rios's first argument, it may be helpful nonetheless to address here his failure of proof on the other two propositions which he needed to establish in order to prevail on that argument. Any question of Mr. Holladay's authority to make a guarantee to Mr. Rios is resolved by reference again to Mr. Holladay's statements and what Mr. Rios reasonably understood them to mean. As noted above, Mr. Holladay quite clearly indicated, on more than one occasion, that he could not bind either the federal prosecutors or the eventual sentencing judge. At no point in his discussions with Mr. Holladay in Cuba did Mr. Rios indicate that he understood anything to the contrary. On the facts before us, Mr. Rios could have had no reasonable basis for believing that Mr. Holladay spoke with actual or implied authority to bind the federal government to any agreement which he may have made.[6]

---

6. *See Roe v. United States Attorney*, 618 F.2d 980 (2d Cir. 1980), in which the Court of Appeals for this Circuit rejected the contention of a defendant that he was entitled to "specific performance" of an unfulfillable promise made by a Government Special Attorney because, the argument went, the defendant incorrectly believed the Special Attorney possessed the authority to bind the Government. The Court declined to apply the agency doctrine of actual

■ Moreover, the law in this Circuit is that, even if Mr. Rios had reasonably believed Mr. Holladay possessed the requisite authority to consummate such an agreement, no action short of actual coercion by Mr. Holladay could invalidate Mr. Rios's plea as long as he had a generalized understanding of the consequences. Mere "allegations of advice and persuasion, not amounting to threats, *by a person not an officer of the court* could, even if proved, never establish the sort of compulsion that would invalidate a plea entered with full understanding of the consequences." *United States v. Antoine*, 434 F.2d 930, 931 (2d Cir. 1970) (emphasis added); *see also United States v. Malcolm*, 432 F.2d 809 (2d Cir. 1970). Thus, Mr. Holladay's status as a party outside the realm of the prosecution or the Court renders less reasonable—as a matter of law—any belief Mr. Rios may have held about Mr. Holladay's authority and any reliance Mr. Rios may have placed on Mr. Holladay's statements. In other words, once Mr. Rios understood Mr. Holladay's tenuous link to the federal judicial system, his burden to show actual inducement by Mr. Holladay's statements increased to the point of requiring physical threats or coercion.

Mr. Rios clearly has failed to demonstrate inducement of this character. Indeed, it is apparent from the record that Mr. Rios returned not only without physical coercion and threats, but fully aware that he faced certain prosecution, probable conviction (buttressed by his apparent intention to plead guilty all along), probable incarceration, and the certainty of the ultimate discretion regarding the length of his sentence resting with the sentencing judge. Viewing the facts of this case as a whole, we therefore find that Mr. Holladay's statements did not induce Mr. Rios to return to the United States, did not render his subsequent guilty plea involuntary, and will not now serve as a basis for the withdrawal of his guilty plea.

### III

In light of the foregoing, it is not surprising that this Court's Rule 11(d) inquiry did not turn up the purported "agreement" between Messrs. Holladay and Rios. While Mr. Rios is correct in pointing out that the "inquiry under Rule 11 is a minimal one and is not conclusive in determining whether the plea has been made voluntarily," Defendant's Memorandum of Law, at 1; *see, e. g., Mayes v. Pickett*, 537 F.2d 1080 (9th Cir. 1976) he is incorrect in his assertion that the inquiry here was "applied mechanically" or "by rote". Defendant's Memorandum of Law, at 5. The inquiry here was, as Mr. Rios asserts it should have been, "an inquiry into the totality of the circumstances under which the plea [was] made." *Id.* at 5.

authority, stating that " '[s]uch principles, borrowed from the commercial world, are inapposite to the ends of criminal justice.' " *Id.* at 981, *quoting United States ex rel. Selikoff v. Commissioner of Correction*, 524 F.2d 650, 654 (2d Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976). Instead, the Court relied on a sort of promissory estoppel doctrine. The Court stated:

"We have held that 'where a defendant pleads guilty because he reasonably relies on promises by the prosecutor which are in fact unfulfillable, he [may have the right] to have those promises fulfilled,' even where the promisor lacks the authority to bind the particular agency whose action is being compelled. *Palermo v. Warden, supra* [2 Cir.], 545 F.2d [286] at 296. However, in the absence of any evidence that appellant furnished any information in reliance on the attorney's representation or promise we hold that appellant has no right under the Due

Process Clause or on any other grounds to specific performance . . . ." At 981.

Thus, no matter what Rios thought about Holladay's authority to make an arrangement on behalf of the Government, the key issue becomes the extent of Rios's actual reliance on Holladay's alleged promises. We find that there was none. In fact, it is fair to say that Rios returned *in spite of* Holladay's statements, not because of them. In this regard, we note Rios's statement at his December 29, 1978, sentencing, uttered prior to the moment when he heard his sentence: "[P]ersonally I really wanted to come here. I wanted to come here and be with the family. I didn't want to be in a place like that [Cuba]." Sentencing minutes, December 29, 1978, at 7. In *Roe, supra*, the defendant's argument failed because "[t]he promise was gratuitous, and there was no detrimental reliance." At 982. Here there was even less: no promise—gratuitous or otherwise—and no detrimental reliance.

Mr. Rios was afforded repeated opportunities to apprise the Court of any arrangement bearing on his sentence. His constant refusal to do so strongly implied that no such arrangement existed. Moreover, the dialogue in open court between Mr. Rios and the Court clearly established that he was entering his plea without reservation and that he knew what was at stake. Mr. Rios stated categorically that no threats and no coercion underlay the plea, and that no promises and no suggestions had been made about the length of his sentence. Without question, Mr. Rios understood that the offense for which he then stood before the Court carried a statutory maximum of life imprisonment; the record reflects that Mr. Rios did not have to be told. Additionally, Mr. Rios's counsel stated on the record that he believed Mr. Rios fully understood the ramifications of his plea, and did not offer any information to the Court about any sentencing arrangement, which he surely would have done had he known of any. Perhaps most telling is the fact that Mr. Rios made no outburst at his initial sentencing—at which he was committed for life subject to the § 4244 study and report—similar to the one at his ultimate sentencing which has given rise to this motion. Mr. Rios in all probability could not have expected the study and report to have produced a significant change in his sentence.

The inference is overwhelming, therefore, that this motion is nothing more than an act of desperation by a man finally facing the enormity of his statutorily authorized punishment for an enormously dangerous crime. Like Don Quixote tilting at windmills, Mr. Rios has thrown himself at an impossible task in the name of returning to a better time. And, like Quixote, he has lost.

The defendant's motion to withdraw his guilty plea is hereby denied.

SO ORDERED.