Claude Theodore HOFFMAN,
Petitioner,

v.

Kurt JONES and Michigan Attorney
General, Respondents.

No. 99–CV–10275–BC.

United States District Court,
E.D. Michigan,
Northern Division.

July 31, 2001.

Claude Hoffman, Carson City, MI, Pro se.

Laura G. Moody, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Kurt Jones, Warden, Michigan Attorney General, Respondents.

***MEMORANDUM OPINION AND ORDER GRANTING LEAVE TO AMEND, REINSTATING CASE, AND DENYING HABEAS CORPUS PETITION ON THE MERITS***

LAWSON, District Judge.

Petitioner, an inmate at the Carson City Temporary Correctional Facility in Carson City, Michigan, filed a *pro se* petition for writ of habeas corpus challenging the constitutionality of his state convictions. This Court's predecessor, the Honorable Victoria A. Roberts, dismissed the original habeas petition without prejudice for petitioner's failure to exhaust state court remedies on the second of his three claims. The Court invited petitioner to "move... for reinstatement of his Habeas Petition after he exhausts state court remedies ...." Opinion and Order of Dismissal at 5. Instead, the petitioner then filed a motion to amend the habeas petition to delete the unexhausted claim and reinstate the petition containing the first and third claims which had been exhausted. The Court will grant the motion to reinstate the case and amend the petition, and as amended will deny it because the state procedures attendant to petitioner's convictions did not abridge any of his rights established under the Constitution or laws of the United States.

## I.

On October 17, 1995, petitioner pleaded no contest to a charge of attempted false pretenses over $100.00, Mich. Comp. Laws § 750.218. During the same proceeding, petitioner pleaded guilty to an unrelated charge of possessing less than 25 grams of cocaine, Mich. Comp. Laws § 333.7403(2)(a)(v). In return, the prosecutor dismissed one count of possession of a non-narcotic, controlled substance in the narcotics case and a charge of assault with intent to murder in a third case. The prosecutor also agreed to recommend that petitioner's sentence run concurrently with any sentence imposed in a fourth case in which a jury convicted petitioner of kidnapping and assault with intent to murder.[1]

The trial court sentenced petitioner to a term of six months to five years in prison for the false pretenses conviction and six months to four years for the drug conviction. After filing an appeal, petitioner moved to withdraw his pleas on the ground that the pleas were involuntary due to the ingestion of drugs. The trial court held an evidentiary hearing on petitioner's motion and then denied it after concluding that the pleas were knowing and voluntary. The Michigan Court of Appeals subsequently affirmed petitioner's convictions in an unpublished, *per curiam* opinion, *see People v. Hoffman*, No. 191446 (Mich. Ct.App. June 2, 1998), and the Michigan Supreme Court denoted leave to appeal, *see People v. Hoffman*, No. 112706 (Mich. Sup. Ct. Feb. 25, 1999).

On June 21, 1999, petitioner filed his habeas corpus petition under 28 U.S.C. § 2254. He alleged three grounds for relief:

1. Judge Borrello's denial of the motion to withdraw the plea is based upon an abuse of discretion and violated petitioner's right to due process.

2. Judge Borrello's conduct at the hearing to withdraw the plea was bias[ed] and prejudicial towards petitioner.

3. Petitioner was denied his federal constitutional right to due process under the Fourteenth Amendment where his conviction was based upon a plea that was not knowing, intelligent, and voluntary.

Respondent then moved for summary judgment based on petitioner's failure to exhaust state court remedies for all his claims and, as noted above, the Court granted respondent's motion, dismissing the habeas petition without prejudice. Petitioner's amended petition simply deletes claim number two. The Court will address the merits of claims one and three.

## II.

The basis for both of petitioner's claims is that he was under the influence of five prescription drugs at the time of his pleas: Darvocet, Xanax, Atarax, Paxil, and Depakote.[2] According to petitioner, the medications impaired his memory and made it impossible for him to knowingly, intelligently, or voluntarily waive his rights or appreciate the seriousness of his choices and actions. This issue was presented to the state court by way of petitioner's motion to withdraw his *nolo contendere* pleas,

---

1. In addition, the prosecutor agreed to release petitioner's dog to his father.

2. Darvocet is an analgesic; Xanax is a tranquilizer; Atarax is an antihistamine, which is used for treating anxiety; Paxil is an antidepressant; and Depakote is an antiseizure medication, which is used to treat mania. *See* Evidentiary Hearing Transcript ("EH") July 1, 1997, at 20 and 23.

and the trial court conducted an evidentiary hearing on the motion.

Petitioner testified at the evidentiary hearing and claimed that the side effects from the medication were sleepiness, impaired memory, loss of ability to think, and a diminished perception of time and space. He also claimed that he had been impaired to the point of being almost comatose at the plea proceedings and that his attorney had to tell him what to say. He allegedly did not know what he was saying and did not understand some of the things the judge was saying. *See* EH December 12, 1996, at 17–21.[3]

Petitioner testified that he had been taking the medication for months before his plea. A physician prescribed the drugs before he entered jail, and a jail physician continued to prescribe the drugs while petitioner lived in jail. *Id.* at 17–19 and 27.[4]

The trial court reacted to petitioner's testimony as follows:

> You know, the problem you've got here, Mr. Booker [defense counsel], very frankly, is that this man was in jail for almost a year before I sentenced him. And he's telling me that he's getting all those drugs in there. That's totally unbelievable. I mean, that is ridiculous.
>
> I watched him testify in the trial that he had before the jury. He was no more under the influence of drugs than I was. And I can assure you I don't take drugs. He testified coherently [and] withstood good cross-examination. He didn't exhibit any of the ... attributes of being under the influence of drugs or that he's being sleepy or anything of that nature.... He exhibited no such ... symptoms when he was testifying.

*Id.* at 28–29. Expert witnesses subsequently testified about the probable effect of the medications on petitioner.

John Evans was the physician who treated petitioner at the Saginaw County Jail. He confirmed that petitioner was receiving Depakote, Paxil, Xanax, Atarax, and Darvocet in October of 1995, and that petitioner had been taking those medications for a number of months before his pleas. *See* EH July 1, 1997, at 8–9. When asked whether he believed these medications impaired petitioner's cognitive function and reasoning, Dr. Evans responded:

> My exposure to Mr. Hoffman indicated that he was alert, he was oriented to person, to place, to time. He was future-oriented, he was able to think rationally. There was no evidence of any type of motor disturbance based upon the medication he was taking. There was no gait .. disturbance. He maintained his balance well. There was no indication to me that there was any significant cognitive or motor dysfunction.

*Id.* at 11.

Dr. Evans further testified that petitioner's cognitive functioning was normal and that petitioner never appeared to be unaware of what was happening. Dr. Evans concluded from a face-to-face interaction with petitioner on October 8, 1995, that petitioner was capable of participating in a court proceeding. He was not aware of any changes in petitioner's treatment between October 8, 1995 and October 17, 1995 when petitioner entered his pleas. He explained that, although the medication had the ability to depress the central nervous system, petitioner had developed a tolerance to the medication and, therefore,

---

3. "EH" refers to the two-volume transcript of the evidentiary hearing on Petitioner's motion to withdraw his pleas.

4. Petitioner stopped taking the medication when he went to prison on November 30, 1995. *See* EH December 2, 1996 at 22.

the drugs did not have the same effect on him as they would have had on a first-time user. *Id.* at 12–16.

David Schneider, a pharmacologist, testified for the defense. He opined that one's judgment and ability to understand legal concepts would be impaired by all the drugs that petitioner was taking. He admitted, however, that the effect of the drugs would depend on the individual and that the drugs would have less of an effect if they were taken for several months as they were in this case. He concluded that, on October 17, 1995, petitioner's cognitive functioning and memory probably were clouded such that petitioner was never fully clear about what was happening. *Id.* at 42–48 and 52–53.

On cross-examination, Dr. Schneider admitted that he had never met petitioner or tested him. He claimed to understand how the drugs in question worked based on his observation of several thousand people who had taken them. He thought that there was an eighty percent chance that petitioner did not understand the plea proceeding. *Id.* at 48–50 and 56.

The trial court responded to Dr. Schneider's testimony by observing that:

[Petitioner] was tried in September, found guilty by a jury of assault with intent to murder and kidnapping. And he took the stand and testified. I watched him testify, exhibited no loss of memory, answered his questions posed by counsel and by the prosecutor forthrightly without any hesitation.

... I practiced law for 30 years before I came on the bench, I've been on the bench for 10, I've seen a lot of people testify. He certainly didn't exhibit any of the symptoms that you described.

And then he appeared in front of me and took a plea and you know ... [h]e responded to all of my questions directly. I asked him what he did that makes

him guilty of these crimes. He responded to that. . . .

When he came up before me for sentencing on both these matters ... on November 27 ... he pointed out corrections in his so-called presentence investigation report, told me that he had a physical handicap of a disc at the L5–S1 level. He ... made various changes. He indicated that he ... hit the victim only one time. He made various changes in both presentence report[s] on the assault with intent to murder and all the rest of it.

Frankly, Doctor, he did not exhibit to me in all of the times I saw him any of the symptomatology that you've described. And you've never seen this person. So you never even saw him in October when he appeared in front of me or September when he testified or in November when I sentenced him.

. . . . .

And are you telling me that nobody could function correctly as I've described him to you with these drugs? Is that what you're telling me?

*Id.* at 54–56.

Dr. Schneider answered,

They may function. Whether they know what they're doing is another question. . . . With the drugs you have on board here, these drugs, in my opinion, you would have a depressed ability to respond to those questions. What you saw was a response, and what you saw was a response that was given in answer to questions. And whether that response was, in fact, knowledgeable to the person who was giving it, I can't tell you that. Given these drugs, I would say there may be some problems with it.

*Id.* at 56–57.

Psychologist Steven Miller also testified for the defense. He interviewed petitioner in prison on February 27, 1997. Dr. Miller opined that petitioner apparently

was impaired across the board with respect to any and all of those [cognitive] functions... That doesn't mean that he couldn't think, that he couldn't attend, or that he couldn't problem solve anything. It just means that all of those functions were ... significantly depleted based on the testimony that Dr. Schneider made here today about what those effects would be on his ability to ... function cognitively.

. . . . .

In this particular instance, what we know about this individual is that he had a lot of drugs on board that would have made him extremely calm. Well, how would that have affected his judgment? In my opinion, it would have made him much less anxious that he should have been in a situation like that to perceive the importance of what was happening to him and to make a decision about that.

And it is not my testimony that he could not make a decision or that he could not respond, or that he could not talk or that he could not, you know, react in some situation. That would not be my testimony.

*Id.* at 73 and 75.

On cross-examination, Dr. Miller testified that it was unlikely that petitioner had a true appreciation of the seriousness of the situation or that petitioner could have explored his options in a rational way. It was *not* his opinion that petitioner was unable to track, attend, or have cognitive functioning.

Dr. Miller thought that petitioner tended to avoid blame and responsibility for his actions. This personality trait, in Dr. Miller's opinion, was consistent with an individual who made a knowing and intelligent decision and later decided to blame some external factor, such as medication, for his situation. *Id.* at 80–87.

The trial court concluded that petitioner knowingly and voluntarily pleaded no contest to attempted false pretenses and guilty to possession of cocaine. The trial court based its conclusion on observations of petitioner at a jury trial conducted from September 19, 1995, through September 25, 1995, the pleas offered in this case on October 17, 1995, and petitioner's sentencing on November 27, 1995. *See id.* 94–99.

The Michigan Court of Appeals held that

the trial court correctly concluded that defendant's plea was knowingly and voluntarily made. Of the three expert witnesses called at the hearing addressing defendant's motion to withdraw his nolo contendere plea, only Dr. Evans had any contact with defendant during the time that the plea was entered. Dr. Evans testified that in his opinion, as of approximately one week prior to entry of the nolo contendere plea—a time when defendant was on the medication that allegedly adversely affected his ability to make a knowing and voluntary plea— defendant could knowingly participate in any court proceeding. This testimony supports the observations of the trial court that both at the plea proceedings and another contemporaneous trial, defendant's cognitive function was not impaired by the medication. We defer to the trial court's unique vantage point to observe and evaluate defendant, particularly because defendant took the stand and testified at the contemporaneous trial. Accordingly, we conclude that the trial court's denial of defendant's motion to withdraw his plea did not evidence an abuse of discretion.

*Hoffman.* No. 191446 at 1.

### III.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), govern this case because petitioner filed this habeas petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

■■■ In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court undertook a detailed analysis of the correct standard of review under the AEDPA. According to the Supreme Court:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412–13, 120 S.Ct. 1495 (O'Connor, J., delivering the opinion of the Court on this issue).

■■■ In evaluating a state court decision under the "unreasonable application" clause, the Supreme Court further stated that a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495.

The Supreme Court also clarified that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," refers only to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495. In determining what constitutes clearly established federal law, therefore, a federal habeas court is restricted to pertinent United States Supreme Court precedent.

■■■ Lastly, and perhaps most importantly with respect to the issues in this case, § 2254(e)(1) requires that this Court

presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith,* 161 F.3d 358, 360–61 (6th Cir.1998).

### A.

Petitioner's first claim is that the trial court's denial of his motion to withdraw the pleas was an abuse of discretion and violated his right to due process.

▇▇▇▇ Initially, the Court observes that petitioner had no absolute right to withdraw his pleas. *United States ex rel. Scott v. Mancusi,* 429 F.2d 104, 109 (2nd Cir. 1970); *People v. Bencheck,* 360 Mich. 430, 432, 104 N.W.2d 191 (1960); *People v. Harris,* 224 Mich.App. 130, 131, 568 N.W.2d 149 (1997). Unless the pleas violated a clearly-established constitutional right, the allowance of withdrawal of no contest pleas is discretionary with the trial court. *See Scott,* 429 F.2d at 109; *Bencheck,* 360 Mich. at 432, 104 N.W.2d 191; *Harris,* 224 Mich.App. at 131, 568 N.W.2d 149. Moreover, a trial court's abuse of discretion generally is not a basis for habeas corpus relief. *Sinistaj v. Burt,* 66 F.3d 804, 808 (6th Cir.1995). As the United States Court of Appeals for the Seventh Circuit has explained,

> [q]uestions of degree—like questions about the proper use of 'discretion'— lack answers to which the labels 'right' and 'wrong' may be attached. When the subject is painted in shades of grey, rather than in contrasting colors, a responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment.

*Lindh v. Murphy,* 96 F.3d 856, 871 (7th Cir.1996), *reversed on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *see also* 28 U.S.C. § 2254(a)(authorizing issuance of the writ of habeas corpus only for violations of federal law).

### B.

▇▇▇▇ Petitioner's third and final claim is that he was denied his constitutional right to due process because his convictions were based on pleas that were not knowing, intelligent, and voluntary. Generally, the only question on collateral review of a guilty plea is whether the plea was counseled and voluntary. *United States v. Broce,* 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). The specific question here is whether petitioner's pleas were voluntary and intelligent. "A plea of guilty is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.'" *Bousley v. United States,* 523 U.S. 614, 618, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)(citing *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). A plea is voluntary if the accused understands the nature of the charges against him and the constitutional protections that he is waiving. *Henderson v. Morgan,* 426 U.S. 637, 645 n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976). A plea is knowing and intelligent if it is done "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

▇▇▇▇ The transcript of the pleas supports the trial court's finding that petitioner's pleas were knowing and voluntary. Petitioner stated that he was thirty-one years old at the time and that he had a twelfth-grade education. He explained that he was currently living in the Saginaw County Jail and that previously he lived at 320 Perkins Street in Merrill, Michigan. He claimed to understand the nature of the charges against him and the plea agreement. He also said that he was freely and voluntarily pleading guilty to the

drug charge and no contest to the attempted false pretenses charge. He stated that he understood the maximum penalties for those offenses and the rights he was waiving by pleading guilty and no contest. *See* PT at 7–13.[5]

Although petitioner was required to give only "yes" and "no" answers to most of the trial court's questions, he did give a factual basis for his guilty plea to possession of cocaine. When the trial court interrupted petitioner to prevent him from giving a factual basis for the no contest plea, petitioner appeared to comprehend the court's comment. He immediately went back to explaining why he was guilty of possessing cocaine. *See id.* at 13–14. If petitioner had been almost comatose as he alleged at the evidentiary hearing, it is reasonable to infer that the trial court, the prosecutor, or defense counsel would have noticed and commented on the record. The trail court's statements at the evidentiary hearings held later establish the contrary fact, and petitioner did not offer any contrary factual accounts at the evidentiary hearings conducted in state court.

The only expert witness to observe petitioner at the approximate time of the pleas was Dr. Evans. He testified that petitioner's cognitive functioning was normal and that petitioner could participate knowingly in a court proceeding. The defense experts opined that petitioner's cognitive functions likely were depleted, but they did not observe petitioner in the months before and after his pleas. One of the defense experts admitted that people can develop a tolerance for medication, and the other defense expert believed that petitioner's claims were consistent with his tendency to avoid responsibility for his actions.

 The Court also is mindful that petitioner apparently did not seek a competency hearing before offering his pleas although he was represented by counsel.[6] He did not raise his pending claims until he filed an appellate brief. He does not claim to be innocent of the crimes for which he was convicted, and it is unlikely at this stage that he would choose to have his pleas vacated so that he can go to trial.

IV.

The trial court determined from petitioner's assurances under oath and the other evidence in the record that he understood the charges against him, the nature of the rights he was waiving, and the consequences of his pleas were credible. This Court has found no basis to rebut the statutory presumption of correctness which attaches to the factual component of this finding. *See* 28 U.S.C. § 2254(e)(1). Likewise, this Court is unable to say in light of all the circumstances that the state court determinations that petitioner's pleas were voluntary and intelligent were unreasonable applications of Supreme Court de-

---

**5.** "PT" refers to the transcript of the plea, which is labeled "Sentence."

**6.** The standard for competence to plead guilty is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396, 398, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)(quoting and adopting the standard found in *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788,

4 L.Ed.2d 824 (1960)). "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings. The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez*, 509 U.S. at 401 n. 12, 113 S.Ct. 2680 (citations omitted).

cisions or unreasonable applications of the facts.

Accordingly, it is **ORDERED** that the petitioner's motion to amend the petition and reinstate the case is **GRANTED**.

It is further **ORDERED** that the habeas petition for writ of habeas corpus is **DENIED**.