Jack Loyd ADAMS, Petitioner,

v.

Sherry L. BURT, Respondent.

No. 04–10050.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 24, 2007.

Jack Adams, Jackson, MI, Pro se.

B. Eric Restuccia, MI Dept of Attorney General, Lansing, MI, for Respondent.

### OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

LAWSON, District Judge.

The petitioner, Jack Loyd Adams, presently confined at the Southern Michigan Correctional Facility in Jackson, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner pleaded guilty to armed robbery, Mich. Comp. Laws § 750.529, home invasion, Mich. Comp.

Laws § 750.5110a(2), and unlawful use of a financial transaction device (credit card fraud), Mich. Comp. Laws § 750.157n(1), in the Oakland County, Michigan circuit court. He was sentenced to twelve to thirty years imprisonment for the armed robbery conviction, seven to twenty years imprisonment for the home invasion conviction, and six months for the credit card fraud, all to be served concurrently. The petitioner alleges that he is in custody in violation of federal law because his plea was involuntary and his sentence was erroneously calculated. The respondent filed a response to the petition asserting that the claims lack merit or are not cognizable on habeas review. The Court finds that the issue of mis-scoring the state sentencing guidelines is not cognizable on habeas review, and the other claims lack merit. The petition therefore will be denied.

## I.

The petitioner's conviction stems from an attack on Kimberly Kowalik on January 9, 2000 by the petitioner and a co-defendant, Richard Taylor, Jr. Investigating police agent Denice Carroll's report to the trial court contains the following description of the offense:

On January 9, 2000, Kimberly Kowalik, age 32, returned to her apartment building after jogging. In the foyer she was confronted by Richard Taylor Jr., who was holding a knife and had some type of mask over his face. He pinned her in the corner, telling her this was a robbery. He led her down stairs. Jack Adams was there, also wearing a mask. He was holding duct tape and a shaft of a golf club. Taylor told her several times that it was a robbery and Adams offered that they would not hurt her if she cooperated. They duct taped her hands behind her back and covered her mouth with tape. They led her to her apartment. Once inside, Taylor instructed Adams to cover her eyes with duct tape. Adams pushed her onto a loveseat and haphazardly taped her eyes. He told her that he was a Christian and hated doing this. He asked her to cooperate. She had some peripheral vision. She was asked if she had any money and where it was at and if she had an ATM card. She could see Taylor take a bank deposit of $420 from an envelope on her coffee table. In her purse, he found her ATM card and VISA card which she told him was at it's [sic] limit. Adams took a piece of paper and wrote down her pin number. She offered them her automobile in hopes that they would leave.

Ms. Kowalik saw Taylor coming towards her with the knife in his hand. Fearing that he was about to stab her, she covered her chest with her arms. He realized that she could see and grabbed her by her hair and pulled her backwards. He then punched her hard in the stomach. He told Adams to tape her eyes better and he refused. Taylor then applied a second piece of tape and then she could then only see directly downward. They led her into her bedroom. Taylor ordered her to lie face down. She hesitated, fearing she was going to be raped. Taylor pushed her on the bed and tied her spread eagle to the headboard and footboard, with a long computer cord and duct tape.

Adams left the bedroom. Taylor was looking for valuables and told her he would kill her if he found any jewelry that she did not tell him about. At least twice he swatted her on the buttocks and said, "you have a nice ass." On one occasion he began rubbing her buttocks and reached between her legs and attempted to insert his finger into her vagina. She was wearing spandex pants and he partially penetrated her vagina. He asked her if she had a lot of hair

down there, to which she replied that she thought he was not going to hurt her. He replied that he was going to leave the room, so that he would not be tempted. After they left, she was able to free herself.

The police were called and found the apartment in complete disarray. A note was left on the coffee table and it was apparently written by Adams saying, "Kim I am very sorry." Ms. Kowalik was transferred to the Police Department and gave a statement.

Petition Ex. D, Presentence Investigation Report.

On June 19, 2000, the petitioner pleaded guilty in Oakland County Circuit Court to armed robbery, first-degree home invasion, and unlawful use of a financial transaction device. Pursuant to *People v. Cobbs*, 443 Mich. 276, 505 N.W.2d 208 (1993), it appears that the trial court agreed to sentence the petitioner to a minimum sentence of fifteen years in prison. Part of the plea hearing transcript reads as follows:

THE COURT: Yes, you can have that. You're pleading guilty to a count-Information that's dated January 19th which is the charging document charging you in Count 1 with armed robbery under which I could sentence you to live or any term of years, to Count 3, home invasion first degree, under which I could sentence you to 20 years, and to Count 5 charging you with using a credit card without the consent of the owner or possessing a credit card without the consent of the owner under which I could sentence you to four years imprisonment.

THE DEFENDANT: Yes, your Honor.

. . .

THE COURT: You understand that I have indicated that the sentence guidelines for this case have been calculated to be between 10 and 17 and a half years. Those are presumptively valid meaning they're-they will be recognized by higher courts as such. Do you understand that I have indicated to your attorney that I would sentence you to no more than 15 years on the low end. In other words, not 10 but that I will start at the time of sentencing at 15 years. Do you understand that?

THE DEFENDANT: Say you would start at 15?

THE COURT: Yes. Now—

THE DEFENDANT: That's the maximum? Is that what you're saying?

THE COURT: No, the maximum I could go—

THE DEFENDANT: Yeah.

THE COURT: and be valid is 17 and a half.

THE DEFENDANT: Right.

THE COURT: But I'm saying I will go at no more than 15. I may go less if I'm satisfied of something such as your attorney's going to present me a sentencing memorandum for the time of sentence.

THE DEFENDANT: I understand.

THE COURT: But—but I—I will not go more than 15 years on the low end. Do you understand that?

THE DEFENDANT: I understand.

THE COURT: In other words, you have exposure to 15 years in prison as a result of this plea today.

THE DEFENDANT: Yes, I understand.

THE COURT: Okay. Do you understand that if I follow that agreement you waive any right of appeal?

THE DEFENDANT: Yes, your honor.

THE COURT: In other words, my decision at 15 years is final.

THE DEFENDANT: It's valid.

THE COURT: Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You understand that?

THE DEFENDANT: Yes I do, your Honor.

THE COURT: You understand if I don't follow that—in other words if I went to 16 years if I went to 17 years, you could set aside your plea and have a trial.

THE DEFENDANT: I see.

THE COURT: You understand that?

THE DEFENDANT: I understand.

Plea Hr'g. Tr. 5–7, June 19, 2000. On August 4, 2000, the trial court sentenced the petitioner to concurrent terms of twelve to thirty years in prison for the armed robbery, seven to twenty years in prison for the home invasion, and six months for the credit card fraud.

The petitioner's court-appointed appellate counsel failed to file a direct appeal within the time allowed for such filings. In a later-filed document, the appellate attorney explained:

> At the time counsel was assigned to represent Defendant, there was a client with a very similar name that counsel had also been appointed to represent. As a result of a file mix-up in counsel's office, a clerical error was made in recording the filing deadline in this case; Defendant's filing date was misrecorded and the deadline for filing the initial application for leave to appeal was missed. This fact was disclosed to Defendant, who requested that counsel continue representing him and attempt to "revive" his appeal by first filing a trial motion under MCR 6.500. Counsel's error can be fairly characterized as excusable neglect, because it did not result from any deliberately [sic] lack of conscientiousness, but rather resulted from plain human error.

Pet.'s Application for Leave to Appeal 1 n. 2 (Jan. 29, 2003). On January 22, 2002, the petitioner's appellate counsel filed a motion for relief from judgment in which he sought to withdraw his guilty plea. The motion alleged that the petitioner's plea was involuntary because he was misled and misunderstood the nature of the plea agreement. The motion also challenged the scoring of the sentencing guidelines. The trial court denied the motion, and the petitioner appealed the trial court's decision without success. The Michigan Court of Appeals denied leave to appeal "for lack of merit in the grounds presented," *People v. Adams,* No. 246306 (Mich.Ct.App. Apr. 4, 2003), and on October 31, 2003, the Michigan Supreme Court denied leave to appeal because the petitioner had "failed to meet the burden of establishing entitlement to relief under [Michigan Court Rule] 6.508(D)." *People v. Adams,* 671 N.W.2d 46, 469 Mich. 949, 2003 WL 22519821 (Mich.Sup.Ct.2003).

The petitioner thereafter filed the present habeas petition, asserting the following claims as grounds for relief:

I. Petitioner's conviction was obtained by way of an involuntary plea relevant to the sentence he would receive.

II. Petitioner's sentence was based on the erroneous [calculation] of offense variables, in violation of due process.

The respondent has filed an answer to the petition asserting that the claims should be denied for lack of merit or are not cognizable on habeas review.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996), which govern this

case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

▮▮ 28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis,* 144 F.3d 429, 433 (6th Cir.1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins,* 539 U.S. at 520–21, 123 S.Ct. 2527 (quoting *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ( internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judg-

ment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold,* 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .

A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The Court defined "unreasonable application" as follows:

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410–11, 120 S.Ct. 1495. *See also King v. Bobby,* 433 F.3d 483, 489 (6th Cir.2006); *Harbison v. Bell,* 408 F.3d 823, 828–29 (6th Cir.2005); *McAdoo v. Elo,* 365 F.3d 487, 493 (6th Cir.2004); *Rockwell v. Yukins,* 341 F.3d 507, 512 (6th Cir.2003) (en banc).

### A.

■ The petitioner first claims that he is entitled to habeas relief because his guilty plea was involuntary and unknowing and is therefore invalid, and because the trial court would not let him withdraw his plea. A guilty plea must be supported by "an affirmative showing that it was intelligent and voluntary." *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The Sixth Circuit has held that:

> [a] plea is valid if it is entered voluntarily and intelligently as determined under the totality of the circumstances. *Brady v. United States,* 397 U.S. 742, 749, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). The constitution requires the circumstances to reflect that the defendant was informed of all the direct consequences of his plea. *Id.* A plea may be involuntary if the defendant does not understand the nature of the constitutional rights he is waiving, or unintelligent if the defendant does not understand the charges against him. *Henderson v. Morgan,* 426 U.S. 637, 645 n. 13, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976).

■ *United States v. Ormsby,* 252 F.3d 844, 849 (6th Cir.2001). "[F]or a defendant's plea of guilty to be voluntary, the defendant must be aware of the maximum sentence that could be imposed." *King v. Dutton,* 17 F.3d 151, 154 (6th Cir.1994).

■ A showing of intelligence and voluntariness generally is made by the State's production of a transcript of state court proceedings to establish that the plea was made voluntarily. *McAdoo,* 365 F.3d at 494 (citing *Garcia v. Johnson,* 991 F.2d 324, 326 (6th Cir.1993)). The Supreme Court has held that a defendant must have "sufficient awareness of the relevant circumstances and likely consequences" of his plea. *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). A plea is voluntary if it is made with full knowledge of its direct consequences, and it will stand unless it is made under duress or as a result of threats, misrepresentations, or improper inducements. *Id.* at 755, 90 S.Ct. 1463.

### 1.

■ The petitioner alleges that his plea was involuntary and unintelligent because he believed fifteen years was the maximum sentence he would receive in exchange for his guilty plea. The plea record lends some credence to that claim, but a review of the complete record leads to the conclusion that the petitioner was aware of the direct consequences of his guilty plea, including the range of possible sentences as limited by the plea agreement. The petitioner was 49 years of age at the time of his guilty plea. The presentence investigation report indicates that he was a high school graduate, he attended community college for a year or two, and he had earned a certificate from a vocational school to be an electrician's apprentice. The petitioner stated at the plea hearing in this case that he was satisfied with his attorney's advice. The trial court then explained that it could sentence the petitioner to life imprisonment or any term of

years for the armed robbery, up to twenty years in prison for the home invasion, and up to four years for the credit card offense. The court further explained that there was no plea bargain and that the prosecutor was not agreeing to a particular sentence. The petitioner stated that he understood.

The court went on to explain that the sentencing guidelines had been calculated at ten to seventeen-and-a-half years. The court then stated that it had informed the petitioner's attorney it would sentence the petitioner to "not more than 15 years *on the low end*." Plea Hr'g Tr. 6, June 19, 2000. (emphasis added). The colloquy between the petitioner and the trial court continued as follows:

THE DEFENDANT: That's the maximum? Is that what you're saying?

THE COURT: No, the maximum I could go—

THE DEFENDANT: Yeah.

THE COURT: and be valid is 17 and a half.

THE DEFENDANT: Right.

THE COURT: But I'm saying I will go at no more than 15. I may go less if I'm satisfied of something such as your attorney's going to present me a sentencing memorandum for the time of sentence.

THE DEFENDANT: I understand.

THE COURT: But—but I—I will not go more than 15 years on the low end. Do you understand that?

THE DEFENDANT: I understand.

Plea Hr'g. Tr. 6, June 19, 2000.

The petitioner allegedly thought that the *maximum* sentence he could serve was fifteen or seventeen years. The sentencing guidelines apply only to a defendant's minimum sentence, and the trial court explicitly said that the sentencing guidelines were calculated at ten to seventeen-and-a-half years. However, there is no evidence that the petitioner was so informed, or that he otherwise appreciated the intricacies of Michigan's indeterminate sentencing scheme. The court stated that it would not sentence the petitioner to more than fifteen years *on the low end* and that it would *start* at fifteen years. But when the petitioner questioned the court, the judge explained that "the maximum I could go and be valid is 17-and-a-half." *Id.* at 6.

The trial court's advice concerning the plea bargain is quite confusing, and it takes little imagination to understand how one untrained in the law might have been misled. There is no question presented by the record as to what the court and the attorneys intended as to the sentencing limitations outlined by the plea bargain, but whether that intent was actually conveyed to and understood by the petitioner remains in doubt on the basis of the plea hearing record alone.

However, the sentencing options were discussed further on the record at the sentencing hearing. There, the prosecutor reminded the trial court that it had agreed not to exceed fifteen years *as the low end of the guidelines*. When the court asked the prosecutor whether she was recommending the twelve to thirty-year sentence recommended by the probation officer, the prosecutor said, "No, [the] People are asking for the 15 years." Sent. Hr'g. Tr. 15, Aug. 4, 2000. The petitioner's own attorney then asked the trial court to abide by the probation officer's recommended sentence of twelve to thirty years for the armed robbery, seven to twenty years on the home invasion, and six months on the financial transaction. The petitioner did not object to the probation officer's sentencing recommendation as summarized by his attorney; nor did he seek to withdraw his plea when his attorney stated the recommended minimum and maximum sen-

tences. The petitioner addressed the trial court, but he objected only to the scoring of the guidelines. He said nothing about the recommended sentence or his understanding of the anticipated sentence. If the petitioner was laboring under a misapprehension of his maximum sentence exposure from the earlier plea hearing, it is reasonable to infer that he would have addressed that confusion when the facts were made clear at the sentencing hearing.

In ruling on the petitioner's post-conviction motion, the trial court determined that there was no defect in its advice to the petitioner that would render the guilty plea involuntary. Viewing the entire state court record, this Court cannot say that the state court's conclusion was plainly incorrect. The record as a whole indicates that the petitioner understood the maximum statutory penalty the trial court could impose. After initially attempting to clarify whether the trial court meant that fifteen years was the minimum or the maximum sentence he could receive, the petitioner professed to understand the trial court's explanation of the minimum sentence. Furthermore, he made no objection or attempt to withdraw his plea when his attorney correctly stated the recommended minimum and maximum sentence at the sentence proceeding.

"Courts naturally look with a jaundiced eye upon any defendant who seeks to withdraw a guilty plea after sentencing on the ground that he expected a lighter sentence." *United States v. Crusco,* 536 F.2d 21, 24 (3d Cir.1976). The petitioner is not entitled to habeas relief on the grounds that his plea was involuntary or unknowing.

### 2.

■ The petitioner also claims that the trial court would not let him withdraw his plea. The record does not reveal that the petitioner ever filed a motion to withdraw his plea. However, in his delayed application for leave to appeal in the Michigan Court of Appeals, the petitioner sought to withdraw his plea.

■ There is no federal constitutional right, or absolute right under state law, to withdraw a plea. *United States ex rel. Scott v. Mancusi,* 429 F.2d 104, 109 (2d Cir.1970); *Freeman v. Muncy,* 748 F.Supp. 423, 429 (E.D.Va.1990); *People v. Bencheck,* 360 Mich. 430, 432, 104 N.W.2d 191–92 (1960); *People v. Harris,* 224 Mich. App. 130, 131, 568 N.W.2d 149 (1997). The decision to permit a defendant to withdraw his plea invokes the trial court's discretion. *Scott,* 429 F.2d at 109. A trial court's abuse of discretion generally is not a basis for habeas corpus relief. *See Sinistaj v. Burt,* 66 F.3d 804, 808 (6th Cir.1995) (finding no authority for the proposition that, when a state court abuses its discretion in denying a defendant's motion to withdraw a waiver of jury trial, the result violates the United States Constitution). The state courts' failure to allow the petitioner to withdraw the plea was not contrary to or an unreasonable application of federal law as established by the Supreme Court. The petitioner is not entitled to relief on this claim.

### B.

The petitioner's second habeas claim alleges that the trial court erroneously scored the sentencing guidelines and relied on materially false information at sentencing. The petitioner attacks the application of offense variables for psychological injury to the victim, aggravated physical abuse, victim asportation or captivity, and exploitation of victim vulnerability. The petitioner contends that there was no evidence to support the scoring of points for those variables because he was not personally responsible for the alleged injury,

abuse, asportation, and exploitation of the victim. He contends that any harm of this nature was attributable to his co-defendant Taylor who planned and orchestrated the crimes and was charged with sexually assaulting the victim.

 The petitioner's argument that the trial court erred in scoring offense variables of the state sentencing guidelines is not cognizable on habeas review. "A federal court may not issue the writ on the basis of a perceived error of state law," *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), and a claim that the trial court mis-scored offense variables in determining the state sentencing guidelines is not cognizable on habeas corpus review. *See Cook v. Stegall,* 56 F.Supp.2d 788, 797 (E.D.Mich.1999).

 The petitioner further alleges that the trial court relied on inaccurate information when sentencing him. A fundamental principle of sentencing holds that "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Grayson,* 438 U.S. 41, 50, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) (quoting *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972)). The Supreme Court, however, has held that a sentence imposed on the basis of "misinformation of constitutional magnitude" violates due process. *Tucker,* 404 U.S. at 447, 92 S.Ct. 589. A sentence violates due process when it was pronounced "on a foundation [that was] extensively and materially false, which the prisoner had no opportunity to correct." *Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). A sentence must be set aside where "the defendant can demonstrate that false information formed part of the basis for the sentence. The defen-

dant must show, first, that the information before the sentencing court was false, and, second, that the court relied on the false information in passing sentence." *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir.1988).

The petitioner has failed to show that the factors considered by the trial court in sentencing him were materially false or constituted misinformation of a constitutional magnitude. The victim reported that the incident traumatized her for life and that she sought psychological counseling after the incident. Due to the psychological trauma, she moved out of her apartment and dropped some classes for which she had paid a registration fee. The petitioner's contends that his co-defendant Taylor planned and orchestrated the crime and that the petitioner was vulnerable to Taylor's suggestion, in part, because he was intoxicated when Taylor approached him with the idea. The petitioner states that he refused Taylor's demand to tape the victim's eyes and that he promised the victim she would not get hurt.

The petitioner raised each of his objections to the scoring of the offense variables at the sentencing. The prosecutor argued that the petitioner acted in concert with Taylor. The prosecutor also noted that the petitioner taped the victim's hands and mouth, thereby increasing her anxiety and vulnerability, and that the two defendants moved the victim from the lobby of the building to the basement and then to her apartment. The trial court considered the petitioner's objections but agreed with the prosecution that the petitioner aided and abetted Taylor and acted in concert with him.

The petitioner has failed to show that the trial court relied on extensively and materially false information. Therefore the petitioner's due process claim has no merit, and it cannot be said that the state

courts contravened or unreasonably applied clearly established federal law.

### III.

The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED.**